Case No. 16-7041. SoundExchange, Inc. Appellant v. Muzak, LLC. Mr. Siegel for the appellant. Mr. Willen for the appellee. Good morning. Thank you, Your Honor. May it please the Court. When Congress changed the statutory license rate standard in 1998, it grandfathered certain services into below-market rates to prevent disruption to their existing operations. The district court held that this grandfather provision actually means that when Muzak acquires a service more than a decade and a half later, it can pay below-market rates for that service, even when the service had already been held to no longer qualify for below-market rates. That conclusion is contrary to the statute, the conference report that accompanied it, and the Copyright Office's ruling in 2006 addressing the scope of the grandfather provision. So both sides argue the plain text of the statute supports their view. And we do believe that the plain text of the statute supports our view. The key phrase here is such transmissions. And the key thing to keep in mind is that such transmissions refers back not to the phrase non-interactive audio-only subscription digital audio transmissions in a vacuum. Rather, it refers back to the— I think that's an important point. I mean, that's a persuasive point, but it doesn't deal with what is the real issue, which is how you define service. Isn't that the key? Well, I'm not sure that is the key. I think it is certainly the case that throughout the statute, service is used in two different ways. But our position does not actually depend on holding that service in the text of 114J11 refers to something other than the business entity. No, but I think—isn't the point that the text itself appears to refer to both the entity and— Whatever. The program or whatever. Sometimes referred to as a program, sometimes referred to as provider, sometimes referred to— And it performs. The service performs something. Business entities perform something, but do subscriptions to channels perform? When I watch NFL ticket, which I don't have, but if I did, would it be performing for me? Well, so you're right that business entities do perform things. But again, going back to the phrase such transmissions, such transmissions refers back to the transmissions by means of which the service performs sound recordings today. That is, in order for there to be an entitlement to these below market rates, there must be a correspondence between the transmissions that the service is making today and those that it made prior to July 31st, 1998. So counsel responds and says they're providing the very same transmission, just got new customers. Well, it is true that they are providing non-interactive audio-only subscription digital audio transmissions, except, again, the reference in such transmissions is not back to that phrase in a vacuum. That—the language such transmissions is preceded by this much longer phrase. I see the—we see the argument in brief. Let me ask you a couple of questions. Suppose DISH were to gain another 50,000 customers. What's your response? Then MUSAC's offering of the DISH CD service to those additional customers would indeed be subject to these below market rates. Suppose DISH bought another company and operated that other company as its customers. In other words, eliminated the other company and just added those customers. So it might depend upon the precise structure of the resulting business entity. What do you mean? I'm saying DISH buys—ECHO is the entity that owns DISH—buys, instead of your hypothetical and your situation, DISH buys—what is the other one, MX? DirecTV. DirecTV. I have a hell of a time. Incidentally, the briefs are not very clear for a Luddite. I apologize, Your Honor. Well, it took me forever to figure out what a non-interactive, whatever, any event. But I suppose DISH—ECHO—buys DirecTV. So in your hypothetical, if the company operating the DISH network were to buy DirecTV and to continue to operate DirecTV's satellite television service, which includes music channels on it, as a separate entity— No, I suppose they merge it. They truly merge it, and they're both served by the same satellite. That is, the DirecTV customers are now simply DISH customers getting television signals from the DISH satellite. The grandfather works. Yes, the grandfather works. Wow. Absolutely. That's sort of a thin distinction. Now, I'll tell you what. I have some questions that puzzle me, no end, not raised, but why did the district court have jurisdiction in this case? So this is an action that certainly does raise a federal question. And I suspect what Your Honor may be getting at is the question whether there's a private right of action. No. Well, not a private—not a right of action in the district court because Congress very carefully provided a mechanism whereby you sound—sound, what do you— Sound exchange. Sound exchange could have gone to the Royalty Board, number one. The Royalty Board, seeing this as a rape dispute but also embodied with a legal question—and the statute is quite clear on that—passes the legal question over to the Copyright Office. The Copyright Office decides the legal question, sends it back to the Royalty Board, and guess what happens after that? Do you know? I suspect that what Your Honor is suggesting is that at that point we would come back to a district court. Wrong. No. The statute specifically provides to go to the D.C. Circuit. Yes. So I want to know how the devil you have—you—nobody told the district court that he didn't have jurisdiction. Well, we don't read the statute to give the— Yes, absolutely, Your Honor. And the question of a new type of operation, you can go to the Royalty Board and complain, and the Royalty Board can, if it's a legal question, send it to the Copyright Office. The Copyright Office decides the legal question, sends it back to the Royalty Board, and then if you're unhappy, you appeal to the D.C. Circuit. Respectfully, Your Honor, that's in the context of initiating a new rate-setting proceeding, which this is not. No. This is a dispute about rates, is it not? No. No, the statute said, let's see, the procedures under Section A and B also shall be initiated pursuant to a petition filed by any copyright owner, which is what you, or either side can do it, indicating that a new type of subscription digital audio transmission service on which sound recordings are performed is about to become operational for the purpose of determining reasonable terms and rates of royalty payments. And then it goes on in the statute, different parts, to say, if there's a legal question, that goes to the Copyright Office, then it goes back to the Royalty Board, and then if there's an objection, there's an appeal to the D.C. Circuit. Now, there are all kinds of cases holding that when Congress provides a mechanism to challenge an administrative agency, well, first of all, this issue clearly could have gone before the Royalty Board. It did in the prior case. And then when it goes to the D.C. Circuit, the District Court doesn't have jurisdiction. If I may respond to some of the points Your Honor has made, again, the statutory provision that you're quoting is a provision that allows for the initiation of a proceeding to set reasonable rates and terms. The situation here is that a rate structure has been put in place by the Copyright and Royalty Board. This is a case about underpayment of royalties, right? Yes. And is it your view that disputes over the amount of royalty that's paid are properly brought to the District Court? Yes, absolutely, Your Honor. Where do you see that? The statute says specifically that if there's a new type, in any case where a novel material question of substantive law concerning an interpretation of these provisions of this title, the subject of these proceedings pursued, the copyright royalty judge shall request a decision of the Register of Copyrights in writing. Now, the fight here is what the proper rate is. Do you believe the rate should be the free market rate rather than the special rate for grandfather? Well, that's exactly what the statute calls for. And there's a legal question as to the legal question you're all fighting about, and that should, it seems to me, go to the Copyright Office. Respectfully, Your Honor, you're absolutely right that in the context of a rate-setting proceeding, the Copyright Office is the entity to which a novel question of substantive law is brought. It's not a rate-setting proceeding. It's broader than that. It's broader than that. As I understand your response, it would be that if this went over to the board, the board would say, we've already set the rate. And there's no legal question here. If they want to modify the rate, that's a whole other issue. But that's not what's happened here. We set the rate. It's in effect for five years or whatever the period is. And they're not paying the amount of royalty that's due under that rate. And you're just the debt collector, as it were. But you see the statute? Yeah, I'm just asking. Do you see Section FC? Yes. The rate-making proceeding shall be initiated pursuant to a petition filed by any copyright owner or any other side, too, indicating that a new type of subscription digital audio transmission service is about to become operational for the purpose of determining reasonable terms and rates of royalty. Well, that's exactly what this issue is, whether the grandfather rate applies or not. Your Honor, a couple points in response. First, this is not a matter of a new type of service becoming operational. Why? Where do you see any definition of new type that doesn't include this? We actually had a case like this, didn't we, that went to the Copyright Office? We had a case that was referred by the district court to the Copyright Royalty Board under the doctrine of primary jurisdiction. When was that? That was several years ago. That's how the last case went to the case of who was the contender there? It was sound exchange in Sirius XX. Sirius? Yes. So you went to the district court first and the district court sent it as a matter of primary jurisdiction. Well, why isn't that exactly the same issue? Although I don't think this is primary jurisdiction. I think this is actual jurisdiction. There are a lot of cases like this. So first, Your Honor, we actually disagree that the district court's decision in the prior case was proper. Why didn't anybody raise it to the district judge? If the district judge had seen it, he might well have concluded, as I do, hey, this isn't just a question of primary jurisdiction. It's a question of actual jurisdiction. So we didn't raise it in this case because, again, respectfully, Your Honor, we don't think that this is applicable. The procedures to determine reasonable rates and terms are – So you thought the prior case was incorrect when the district court sent it as a matter of primary jurisdiction? No. We thought that the provision that you're referring to, FC, is just an opposite to the situation here. Procedures to determine – Well, whether it is – I don't think it is an opposite. It looks to me like it's exactly covered. In any event, I simply do not understand why competent counsel wouldn't have alerted the district court about this concern. So two further points, Your Honor. With respect to the notion of a referral to the district court under the doctrine of primary jurisdiction, again, that's appropriate where – You mean referral to the copyright? Yes, referral to the Copyright Royalty Board under the doctrine of primary jurisdiction. That's appropriate where the agency has not ruled on the issue. Our position, as set forth in the briefs, is that, in fact, the Copyright Office has ruled on the issue. In its 2006 ruling, it confronted the question whether – and this is a direct quote – the question is whether the University of California Distance Prescription Services was limited to music choice, DMX, and news app provided over the DISH network. And it said yes. If I may go back for a moment, though, to this question of proceedings to determine – If they had decided in your favor, there's no reason not to bring a new action. And if they disagreed with you, pursuant to the statute, come to the D.C. Circuit. District courts in the circuit routinely do pass on matters of statutory construction and matters of – Of course, unless the D.C. Circuit's got jurisdiction, in which case they lose jurisdiction. Absolutely. If the D.C. Circuit would have had jurisdiction, then – Well, you know, the statute specifically provides review of legal conclusions by the Register of Copyrights. When a decision has been rendered pursuant to this subparagraph, the appeal is under 803D in the United States Court of Appeals for the District of Columbia Circuit. This is on D. You know about that. Yes, so – You know, even if you disagreed with this, which I frankly think you're wrong, why wouldn't you bring this to the attention of the district judge? This is a – number one, a prior court has done primary jurisdiction. Number two, there is at least a question here as to whether the district court has jurisdiction. Again, Your Honor, I don't think there is a question whether the district court has jurisdiction. And if I may just take a moment to explain what the proceedings to determine reasonable rates and terms actually are. Proceedings to determine reasonable rates and terms happen at the beginning of or in the middle of a rate-setting period, and they actually set forth the rate for this kind of service shall be 2 cents per play, 5 cents per subscriber. But whether the rate is one or the other depends entirely on whether there's a grandfather provision, right? Which is the legal question. It is a legal question, but it's a – That's what the statute says. Legal questions go to the Register of Copyrights, appealed to the D.C. Circuit. The legal question goes to the Register of Copyrights only when it is brought in the context of a proceeding to determine reasonable rates and terms. No, in any case in which a novel material question of substantive law. And you start and you go back and it says whenever there's a new type of service. This is clearly a new type of service. And I apologize, Your Honor, just that I'm reading from the correct place. The novel question of substantive law provision that you're reading from is 802. Yes, but I will go back. Okay. The procedures under Paragraph A and B shall also be initiated pursuant to a petition filed by any copyright owner, any pre-existing subscription service, or anybody else, indicating that a new type of subscription digital audio transmitted service in which sound recordings are performed is bound to be operational for the purpose of determining what the reasonable rates and rates of royalty payments with respect to such new type shall apply. Again. Does that answer the question? In the new type, is it grandfathered or is it not? Again, Your Honor, that is a circumstance where a new type is scheduled to become operational. This is not a situation where a new type was scheduled to become operational. Why? That's exactly your – basically that's exactly your argument, isn't it? No. That's why the grandfather shouldn't apply, because you say it's a new type. No, Your Honor. We think the grandfather shouldn't apply because this is a service that existed before as a new subscription service operated by DMX and was brought within the MUSAC heading. Oh, so you say it's not a new type, but the other side says it's a new type, right? No. We haven't argued anything with respect to – No, but that's what you're just saying. This is not a new type, but they think it's a new type. I'm not sure that they think it's a new type. Well, it's certainly true that for some reason that is absolutely beyond my comprehension, nobody raised the jurisdictional question with the district judge. I don't know why the other side didn't. But neither side trusted the Royalty Board. Again, Your Honor, it's not a matter of not trusting the Royalty Board. But is it not true that the Royalty Board faced almost this exact same issue involving sound exchange and Sirius? Yes, and if indeed – excuse me. I apologize, Your Honor. I thought you were referring back to the 2006 decision. No, it was not the exact same issue by any stretch of the imagination in sound exchange and Sirius. It was a matter of the Copyright Royalty Board interpreting its own regulations. It was not a matter of it interpreting a statute. And we believe that the Copyright Royalty Board actually did not have jurisdiction to engage in that subsequent reinterpretation. Ah, so you challenged the jurisdiction in that prior case. In other words, you don't think it was a new type. That prior case went to the Copyright Royalty Board under a provision completely separate from the new type provision. And then over to the Copyright Office for the legal question. No, not over to the Copyright Office for a legal question, except as to the jurisdiction of the Copyright Royalty Board to interpret its own regulations, which is something that's not at issue at all here. That's a different – but the ultimate question, whether or not Sirius could get the grandfather. So now it sounds like you're – and I apologize if I've misunderstood your questions, Your Honor. Well, I – you'll first have to forgive me for pressing so hard. No, that's – Because there's nothing more important for a court of appeals is a question of whether or not we have jurisdiction. Now, we would clearly have jurisdiction if it was coming from the Royalty Board because the statute provides. And typically when Congress does that, and there are a lot of cases to this extent, it is implicitly rejection of the district court's jurisdiction. So if I may respond to your question about the Sirius question going to the Copyright Office. That took place in the context of a rate-setting proceeding. There was a proceeding that was ongoing to set royalty rates and terms for, among other things, preexisting services. That is, to set this schedule. This gets 2 cents. This gets 3 cents. This is per subscriber. And it was – I don't understand your interpretation of C, which was clearly designed A and B deal with setting rates. But C deals with a new type. And the question is, do the rates apply to this new type? Which is exactly the issue we have. A and B do apply to – do concern setting rates. The difference between C and A and B is C refers to a mid-cycle rate-setting proceeding. No, it doesn't say mid-cycle. It says a new type of subscription, digital audio transmit service. No, he's talking about A, yeah. Huh? He's talking about A, yeah. No, I'm talking about C. I know. I'm sorry. No, you two are just talking past each other at this point. I thought you were talking about C. Yes, I absolutely was talking about C. I'm sorry. Where did you get this mid-cycle notion? There's nothing left. That term is not in C. It's clearly designed to say, okay, you've got a new type, so what rate applies? Right. So A and B are the rates. Yeah, the normal rates in the situation. Right. I'm looking at C. C, the procedures under subparagraphs A and B also shall be initiated. Meaning it's a different kind of problem. Yes. Yes, but it's still the same sorts of procedures. That is, procedures to determine reasonable rates and terms. And these procedures are set forth in copious detail in Chapter 8. These are full-blown trial-type proceedings that last multiple weeks with discovery and witnessing. But in this case, it's just a strictly legal question, isn't it? It's not a big fight over how you determine the rates, but whether the rates, the grandfather rates apply or not. So this is exactly, it seems to me exactly what the draftsman contemplated. That would go over to the Copyright Office. The Copyright Office would make the legal judgment, send it back to the Royalty Board. The Royalty Board would incorporate it, and if anybody objected, it would go to the D.C. Court of D.C., sir. Again, Your Honor, that's just not how we understand F.C. And I don't think it even occurred to us that F.C. might provide an avenue for SoundExchange or for MUSEC to bring this matter before the Copyright Royalty Board or the Copyright Office. The procedures under subparagraphs A and B, again, these are intricate procedures that the industry is … You're going around in circles because I'm looking at C, not A and B. And again, these are for the purpose of determining reasonable terms and rates of royalty payments. Reasonable terms and rates of royalty payments … Well, with respect to such new type of transmission service. And again … So its question is whether the grandfather clause applies or not. But again, Your Honor, this is not a new type of subscription digital audio transmission service. This is … It sure looks new. Of course, new type is not defined. It's true. But it sure looks like a new type to me. And we do have the previous case involving series where it seems to me the Royalty I'm sorry. I'm sorry. I don't want to overuse my time. I apologize. Maybe what we ought to do … I mean, obviously, we're here for the other side. But get briefing on the jurisdictional issue rather than try to sort it out.  Yeah. All right. Let's hear from counsel for Eppley. You were the defendant in this case. Why in the devil did you not raise these cases? Good morning, Your Honor. Oh, I hate to be in the position of agreeing with the other side in this case. But we actually agree with them on this jurisdictional question that the court has raised. So, a couple of things. So, there is no ongoing Royalty procedure happening right now. So, the only way that there could be a jurisdiction in the Royalty Board is under C. And it's our view that what's happening here, this is not a new type of subscription service. This is simply MUSAC operating as a PES, operating under the PES Royalty, providing … Okay. I see why you wouldn't want to raise it. Right. I don't see why you wouldn't raise it because you don't want to concede that there's a new type. So, it's not so much a concession with respect to our legal argument because, actually, I think that F1C is highly relevant to the actual legal issue that's presented in this case. What F1C tells you is that you can be a pre-existing subscription service and make available a new type of subscription service and still pay for that service as a PES, at the PES pre-existing subscription service rate. Even if this was not exclusive jurisdiction, which I think it is, why isn't it primary jurisdiction? Well, so … Why are you both avoiding the Royalty Board? I don't get it. In a serious case, you want to rely on the serious case, don't you? Sure. We think the 2006 decision supports our position. So, why wouldn't you want to get back to the Royalty Board and say, look, you previously have indicated that the key in determining the grandfather scope is the entity involved. Correct. So, you want us to defer to the Royalty Board's interpretation, don't you? You have said that. Well, we think … Your brief says that. Sure. Yeah. We think the Royalty Board got that completely right. So, you want us to defer to the Royalty Board's interpretation, but you don't want to go back to the Royalty Board. Well, it's not a question of not wanting to be in front of the Royalty Board. It's not a question of desire. But you are arguing we should defer to the interpretation, the Royalty Board's interpretation or the Copyright Office's interpretation. Well, with respect to the question of whether service means business entity, our position is first that that's clear from the face of the statute. Well, I know that. But your alternative argument is if we look at the prior decision of the Royalty Board, it's in your favor. Yeah. It's clear as day that they held that the term of service … Clear as day may be a slight exaggeration. But if it was clear as day, why wouldn't you want to go back to them? As I say, it's really not about where we want to be. It's about where we think jurisdiction lies. And our reading of 114 … Even though in the prior case, the district judge sent it to the Royalty Board as an exercise of primary jurisdiction. Well, the Royalty Board has the authority to set rates, as Mr. Siegel said, to determine what rates apply. That is, under the different formulations, whether you're talking about the PEZ formulation, you're talking about the willing-buyer-willing-seller formulation. I have difficulty understanding why this case doesn't involve the question as to what rate applies. Well, it involves the legal question of whether MUSAC operates as a pre-existing subscription service with respect to these transmissions. I couldn't agree, but it's still based on the question of whether there's a new type or not. There is, as Mr. Siegel says, a provision that is designed to allow the parties, when a truly new kind of service comes into the market, to get a rate set. So, what truly is the key? This is a new type, but not a truly new type. I apologize if there's confusion. No, I wasn't confused. Our position is that what's happening here, with respect to the transmissions that MUSAC is making to DirecTV and the other cable systems that it's servicing, those are not new types of subscription services. They're new customers. They're new customers, exactly. They're basically the same as our existing service that we've been providing to DISH for many years, involving the same types of works and the same type of service. We're just servicing an additional set of customers. And it's our position that that clearly is covered by the definition of pre-existing subscription service. You don't even have to address the question of new type of subscription service. It's not a new type of subscription service, in our view. So, in our view, 114-F1C has no direct applicability to this case. Now, the existence of that provision is very important for our legal argument, because I think it completely undermines the understanding of 114-J11 that SoundExchange has offered. And I'm happy to discuss that. Go ahead. Sure. So, their position is that the term such transmissions in 114-J11 refers to the same service offering, right? Essentially the narrow, historically defined service offering. And if you're not providing transmissions in connection with that historic service offering, you can't be a PES. It can't be a pre-existing subscription service. Now, 114-F1C makes clear that that can't be right. Because what 114-F1C does is it says that you can be a pre-existing subscription service and offer a new type of subscription service and still qualify for PES treatment. If this were a new type of subscription service. If this were, exactly. Then you would agree that the jurisdiction would be in the D.C. Circuit. Yes. So, if MUSAC had actually come up with a new type of subscription service, for example, if it wanted to stop making transmissions through DSHR Direct TV but provide transmissions directly to customers. That might be an example. Through the Internet. In that case, arguably, that would be a new type of subscription service. So, in other words, your view also is the prior, primary jurisdiction exercise, the District Court, the Senate, the Royalty Court was also incorrect. I think it was a different situation. But you say it was incorrect. I don't know that we have a position on it. Wait a minute. I'm asking you for your position. You have to. It may have been. It may not. It may have been under the circumstances incorrect. It may have been under the circumstances correct. This is an area where if the Court would like to get supplemental briefing on that kind of question, we'd be happy to provide it. Occasionally, we have cases where both parties wish to avoid a jurisdictional hurdle for their own reasons. And then it's up to the Court to conclude on its own. Since these are both excellent law firms, I can't help but conclude there's a good reason why both wanted to avoid the Royalty Court. I don't have any doubt that if you'd taken this to the Royalty Court, they would have decided it. Well, so I don't want to keep pressing on the same point, but I think it is important. You don't have anything interpreting new type by the Royalty Board. You pointed out we should defer to the Royalty Board and the Copyright Office, but you don't have anything defining new type, do you? Well, we don't. It's not a term that's defined in the statute, and I'm not sure that there's been decisions from the Royalty Board or the Copyright Office that actually define what it means. But if this case involved a new type, we would not have jurisdiction. Do you agree with that? I agree with that. I think that then we would have to use the procedure, or sound exchange would have to use the procedure, in 114F1C. But this is not— I understand why you wouldn't want to argue about jurisdiction now, because you won. Well, I respect the jurisdiction of the Court, and if we thought that there was a serious jurisdictional hurdle, of course we would not hesitate to tell the Court that. But I think in this case, this was not a matter of some sort of collusion between the parties to get this case in the district court. Why did you say collusion? I'm not making that suggestion. So this is a matter of trying to understand what the scheme that exists in 114F1 provides. And in our understanding, where you have an ongoing rate-making procedure, then, of course, novel questions of law that are relevant to that procedure can be kicked up to the Copyright Office, as happened in 2007. Don't you think that your opponent is arguing, essentially, that there's a new type of service? Well, I think they are reluctant to make that argument. But isn't that the argument they're making, that it's a new type of service? Well, here's the problem for them making that argument. But isn't that not what they're arguing? You may reject it, but isn't that what you basically – I read your brief as – Yeah, I mean, I think this goes to the essential problem with their legal argument, is that they don't want to say this is a new type of subscription service. And the reason they don't want to say that is because it's clear from 111F1C that you can offer a new type of subscription service as a preexisting subscription service and pay at the PES royalty. So they don't want to say that because it undermines the legal position that they're taking. I understand. That makes sense. So I'm – Can I direct you back to the statutory argument about the meaning of service? Of course. And why you think it's clear that service means business entity? Sure. So there's two primary reasons for that. One is, I think, what you pointed out, Jeff Griffith, which is that the statute refers to a service that performs. So the active use of the – Because the ordinary meaning of service wouldn't lead one to think it's a business entity, right? I think perhaps the term in the abstract could be read either way, as the Copyright Office said in 2006. But what the Copyright Office said in 2006 is that in the context of determining who a preexisting subscription service is and who gets to pay the PES royalty, the statute can only be read – only be read – as referring to the business entity. And I think that's consistent. Is that what was going on in the 2006 – It's part of what was going on because there was – They didn't really address the issue we have to address. That's exactly right. The 2006 proceeding was limited on this issue to the question of whether Sirius could get access to the PES royalty in connection – Whether they wanted to be free. Right, right. Yes, in connection with the transmissions they were making. That's important for us, isn't it? Because there's not a matter of us deferring to the Copyright – I mean, this is us deciding for the first time whether the meaning of service is clear or not, right? Yes, I quite agree with that. Indeed, the Copyright Office said specifically that the statute uses service in two different – Right. At least two different meanings. I think it's three. So the Copyright Office, which we should defer to according to everybody, says that service is an ambiguous term. Well, it did say that, but if I could read what I think is the key passage from the Copyright Office's decision. It says, while usage of the term pre-existing subscription service is ambiguous in some instances, it's used to identify who receives the benefits of the designation and has the authority to operate under the statutory license and enter into negotiations to set rates and terms, can only be read as referring to the business entity identified as the pre-existing subscription service. So it's – What does operate mean? Excuse me? What does the word operate mean? I couldn't figure that out either. What does operate mean? Oh, I think what that means is simply provide – make transmissions under the statutory license. So the business entity operating its service – DISH being the operator, which confuses me. Well, yes. There certainly was some confusion that I think was created by some of the legislative history references to DISH. Now, that was – No, but I mean, even the Copyright Office refers to the operator as DISH at some point, so I can't figure out whether the operator is MUSAC or DISH. Yeah, I think it's very clear from what the Copyright Office ultimately says is that the operator of the service, the entity that provides the service, is MUSAC, and therefore it's MUSAC that is entitled to the pre-existing subscription service. But this is the question for us, whether MUSAC's – whether all of its offerings are entitled to that, right? Yeah. And that's not an issue that was decided by the Copyright Office. That is absolutely right. That is 100 percent correct. So your position is if MUSAC buys every single – or the company that owns MUSAC – buys every single entity – I'll use entity – that is in the business of providing the transmission, how do you describe what – and that's my confusion – how do you describe what DISH does? So DISH has the customers, right? Yes, but what does it do? Well, there's essentially a set of transmissions that MUSAC has of music channels. I'm asking what DISH does. Right, and so – well, what DISH does generally is provide satellite television programming to its end-user customers. And you're like – you provide gasoline for the trucks. You provide music. You provide content for the channels. Yeah, that's right. We're essentially a service provider for DISH. And who pays who on this? DISH pays us. And who listens to the channels? Right, I mean, I don't know whether anyone is a subscriber of cable or satellite, but what these are are essentially audio-only music channels that you would be able to watch through your television. But there are competing companies, right? Yeah, DirecTV and others. How many are there? Oh, how many satellite MVPD providers are there? I'm not sure. I don't know. Well, tell me. I think there's probably two primary satellite providers, and then you have a host of cable services. If you were to buy them all, then your grandfather rates apply to everything, right? Yeah. So you buy them all and you merge, and there's only one satellite or whatever it is that your music goes across. Right, so – And you then have grandfather status for everything. Well, we are entitled as an – Yes or no? Yes, if the transmissions that we are making take the form set out in Section 114J11. So you could buy up everybody, and you could have one massive operation, and you would be the sole transmission agent, whatever you call it, with the music, and the rate would be the grandfather rate. The rate would, for Muzak, if Muzak – That would clearly be contravening what Congress was trying to do here, right? No, I don't think so. Congress was siding with the copyright holders, right? You all won the first round. They were trying to help the copyright holders. And under Judge Silverman's hypothetical, as I understand it, the copyright holders are right back where they were before the digital millennium copyright act. No, not at all. Let me try to address what Congress was doing. Sure. So Congress recognized in 1998 that there had been a small number of pioneering services that had entered into this nascent market and taken a risk to come into this market at a time where it was uncertain. And when Congress enacted the DMCA, it was going to provide a rate formula that was going to – Which was to protect the copyright holders, right? Well, the DMCA is a very complicated statute. It was balancing a lot of – Yes, at least this part of it. Well, I think what this provision should be understood as is about – Protect is not the right word, perhaps, but to help the copyright holders. I'm not sure that I would say help the copyright holders. I think what I would say is provide – But they got more money out of it than they were getting before, right? If you were a copyright holder, you got more money than you did before. Well, one thing that's important to point out about that is Congress in the DMCA didn't set the rates. It created a rate formula, right? One was based on statutory factors, and the other was based on a willing buyer, willing seller formulation. Now, there's no necessary reason that that dictates what any given rate is in a rate-making procedure. The parties negotiate those rates. They're ultimately determined by copyright royalty judges. That happens every five years. Now, historically, it's certainly true that the preexisting subscription service rate has been lower than the willing buyer, willing seller rate, but that's not something that's enshrined by the statute. What the statute enshrines is a particular way of making that determination, a particular set of factors that are going to be used. So the question of what the ultimate rate is is one that the parties have the ability to negotiate, and it gets reexamined every five years. So to your question, what Congress wanted to do is make sure that the entities, the pioneering entities, MUSEC obviously being one of them, that were in the space prior to the enactment of the DMCA were able to— Were they below market rates? Well, they were not based on a willing buyer, willing seller formulation. The facts of the matter is the ALJs had established below market rates, right? Yeah, that's fair. And Congress was acting to address that concern. It was definitely acting to create a different rate formula for new entities and new services that were not subject to the preexisting subscription service formulation. But what I reject is the idea that Congress didn't intend or anticipate that those entities that were providing service prior to 1998 wouldn't be allowed to develop and expand their businesses. There's no support for the idea that those services were meant to be frozen in amber, were meant to only be allowed to provide the same set of transmissions to the same customers that they were servicing prior to 1998. Unless we disagree with your meaning of such transmissions, right? Well, I think the phrase is—it's hard for me to read it any other way. What you have in 114J11 is a list of means by which transmissions are made, by means of non-interactive, audio-only, subscription digital audio transmissions. That's the thing that has to be done in the present day. You have to make transmissions by those means. And then the statute goes on and says that the service, meaning entity— we know it means entity because the grammar doesn't work any other way and because the copyright office has told us that it has to mean entity— was in existence in making such transmissions to the public. So the phrase such transmissions simply refers back to the form of the transmissions in the first clause. Let me go back and ask another question. Do you understand the plaintiff's case here to demand underpayment of fees that they're entitled to under the royalty provisions? So, yeah, that's their theory of the case. That's the claim that they've brought. Are you aware of the provision on the jurisdiction of our court that specifically says Section 706 of Title V shall apply—that's the Administrative Procedure Act— with respect to review by the Court of Appeals under this subsection? If the court modifies or vacates the determination of a copyright royalty judge, judges, the court may enter its own determination with respect to the amount or distribution of royalty fees and costs and order the repayment of any excess fees or the payment of underpaid fees. Isn't that exactly what's involved in this case? Well, that is certainly the claim that they're—that's certainly what they're seeking. That's our jurisdiction. That's another provision of the statute that says jurisdiction of court. Right. So it's certainly possible that if there had been an ongoing rate-making procedure or if this were a new type of subscription service where F1C applied, that the process that you outlined would be perfectly appropriate and then the court would have the jurisdiction to— We—there's several things that occurred to me. One, we could ask the Royalty Board or the Copyright Office for their view as to what jurisdiction. But I suppose we, as an exercise of primary jurisdiction, but with the concern about whether we have jurisdiction at all, sent it over to the Royalty Board Copyright Office, because they both get it then, and they concluded, yeah, this is exactly our jurisdiction. Then what? Well, then I think we would have to accept that. I'm not sure that there is a basis in the statute for them to reach that conclusion. Well, it's only a question of what type means. Yeah, I mean, and certainly it's our position that this is, though the new type of subscription service language— Yes, that's exactly what our authority is. Then you would say we should defer, then we should conclude the district court did not have jurisdiction. Well, I would say— I know you're trying to hold on to an opinion. No, no, no. We certainly like what the district court did. I would say two things about that. So one is, yes, if the Royalty Board or the Copyright Office decided somehow that this, what was at issue in this case, was actually a new type of subscription service that was covered by F1C, and on that basis took jurisdiction over the dispute between the parties, that absolutely could happen. Now, I would say that if they did that, it would confirm that we are entitled to pay as the preexisting subscription service and at that rate for those transmissions, because that's what the statute expressly says. That would depend on what the Copyright Office says. Well, I mean, the whole reason that that provision exists— I know your point. Yeah. I know your point about it. But if the Copyright Office disagreed with you, you'd be up the creek. Or at least you'd be back in this court on appeal. Well, yes. They would have to say two things that I think are simultaneously impossible to say. One is that it's a new type of service, and the other that somehow it doesn't fall within that statute, which makes clear that a preexisting subscription service is entitled to be a preexisting subscription service when it makes a new type of subscription service. So I don't know how they would square that circle, but I suppose they could come up with something. I see you. That's based on your statutory interpretation. I'm sorry to call my colleagues to raise this issue, so what I'm trying to say is really quite confusing. Well, yeah. If the Court would like supplemental briefing, obviously that's something we prepared to provide. I think we should ask the Copyright Office for their views on this, or the Royal Court, or both. Or maybe it's the government that represents them. Because if they say, yes, we have jurisdiction, then it's clear that this Court did not have jurisdiction, and we have jurisdiction on appeal. And there are a lot of statutes that provide something similar to this. Anyway. Yeah. Well, the NLRB is one of them. Right. District courts do not have jurisdiction to decide various cases under the NLRB. They go to the Court of Appeals with language very sort of similar to this. Right, except for the fact that we have this problem of whether this is a new type of service. New type. Yeah. And in our view, and I think this is basically the position that SoundExchange has taken all along, this is not a new type of service because, in their view, it's a service that had been provided by somebody else. In our view, that makes no difference. What matters is the nature and form of the transmissions and the fact that MUSAC, as an entity, is provided. And I think that question is a pure statutory interpretation question properly presented to this Court. But if there are no further questions, I will sit down. All right. Thank you. All right. Counsel for Appellant, do you want to take maybe a minute? All right. Let me just respond very quickly. Yes, it is absolutely our position that this is not a new type of subscription service. This is a service that had been around, that had been a PES, that had ceased to be a PES, and that- Ceased to be what? Excuse me. Industry speak for pre-existing subscription service. Can you just hold it? P-E-S is how- Oh, P-E-S. I apologize, Your Honor. So that's my first point. He doesn't like acronyms, as you may know. In this case, I just didn't understand. Again, I apologize, Your Honor. And the second point I'd like to make is that I think the Copyright Office's ruling in 2006 is actually fairly clear on what they understand the scope of below market rate eligibility to be. They say- You mean what the scope of the Grandfather Clause is? Yes. Yes, the same thing. And this is on page 64646 of the Copyright Office's ruling. MUSAC was the pioneer music service that incurred both the benefits and the risks that came with its investment, and one such benefit was its status as a pre-existing subscription service so long as it provided its music offerings over the DISH network. There's that, and there's also the fact that several times in the decision, the Copyright Office restates the question posed, and that question concerns- Your view is there are two conditions. One, the business entity. Two, the- I think you call it the performance. Or service offering. Or the offering of various things. Both of those have to be clear. Yes, absolutely. Now, suppose DISH bought every other operator. Then you still say the Grandfather Clause extends to that? Again, it depends upon the circumstances of that- I'm giving you a hypothetical. DISH, ECHO, whatever it is, buys everybody else. So if DISH simply buys everybody else, then everybody else, the service offerings provided via everybody else are not within the scope of the Grandfather Clause. Why? Why? Because- No, you asked, it was just two conditions. MUSAC plus DISH. So, again, Your Honor, if what DISH has done is use its satellites, that is, the DISH satellite system to serve those customers, then yes, it's within the scope of the Grandfather. Again, Congress in the- So they could buy up everybody and have all the customers. If, however- Yes or no? Again, it depends on whether it's simply buying up everybody or actually serving those customers via DISH satellite. If, for instance, DISH were to buy- So DISH buys all the other satellites and combines them into one satellite? My knowledge of technology is rather rudimentary, but it seems to me conceivable that DISH could do that and have a monopoly of all the satellites or all the mechanisms to distribute music. Well, so there are other ways to distribute music in this fashion besides satellites. So, hypothetically, Your Honor, if DISH were to buy a cable provider, Comcast, for instance, and MUSAC were to serve Comcast's customers music channels, then those transmissions would not be subject to preexisting subscription service rates. DISH got bigger. DISH got bigger. Your argument is there's two conditions. The business entity, which is MUSAC, and the operator, I guess, which is DISH. DISH just gets bigger. Again, if it's merely- That is your position. There are two conditions, right? Is that right? So business entity is the first condition. And the other condition is? The second condition is it has to be the same service offering which Congress in the conference report made clear- Again, if it's- DISH got monstrously bigger. If it's DISH getting bigger and the DISH satellites serving all the customers, then yes, that's within the scope. If it's DISH getting bigger as a corporate entity by virtue of acquiring a cable system as opposed to a satellite system and MUSAC serving- Why is that not included? That's not included because- It's not the same transmission. In that circumstance, it would not be a new type of pre-existing subscription service. In that circumstance- It would be a different pre- I'm sorry, I didn't hear that. No, I see what you're saying. If there are no further questions- Thank you. Thank you. All right, we'll take that case under advisement.
judges: Rogers, Griffith, Silberman